Mr. Lamer. You've appeared before, and I think I've forgotten the pronunciation of your name. Lamer. Lamer it is, as opposed to Lamer. Anything close, though, I'll answer to it. Very well. Thank you. Good morning, Your Honors. For the formality, Mark Lamer for the Appellant, H&S Manufacturing. What we're here on is an appeal after trial, the trial court sustaining the government's finding of a termination for default, and the issue that we raised, and we think that the trial court dropped the ball on, is whether the government breached the inherent duty to cooperate with the contractor in this instance. I think what the key here is, is that this was an item that was being procured for the first time, and even the government's technical expert at the trial indicated that in order for this contract to work, there had to be a combined effort. And what we believe the evidence fairly showed is that there was not a combined effort, and I don't want to suggest, and we never did suggest, that there was any ill will on the part of the government towards the contractor. I think the trial court somehow, I think when you argue the breach of the duty of good faith and fair dealing, that duty to cooperate, it doesn't necessarily mean that you're alleging bad faith, and we didn't. What we believe the evidence fairly showed is that because it was a new item, the people at the government agencies charged with enforcing the specification had difficulty understanding exactly what was required to make an acceptable item. And as a result of that, what the contractor was facing was almost an inspection standard du jour. What was acceptable on one inspection with one group of inspectors was unacceptable the next time with a different group of inspectors. And perhaps the best example, and it was early on in the contract, was the very first lot that was shipped. Because it was the first lot in August of 1999, the government sent down an inspection team of all the experts, Army, Navy, DSCP, and the local inspector from DCMA. That team of experts looked at that first lot, passed it. When it went to the depot, a different inspection team looked at that same lot and rejected it. So we had this going on through the life of the contract. When you get to the key period of time, which is the time frame September, October, November of the year 2000 here, the Navy, which was the specification preparing activity, was convinced that the vests that the appellant was producing and that DSCP was accepting were unacceptable. And there's a memorandum in the record, and I believe it's at A129-130, that essentially the Navy refused to accept any of the vests that H&S had produced that were accepted in September of 2000 and recommended that the contract be terminated for default. Now, while this is going on, the Navy is making specific, and it's, I'm sorry, A111, A112. And in that memorandum, the Navy is essentially arguing that DSCP is accepting vests that never should have been accepted and that the Navy's view is that none of these vests are acceptable and the contract should be terminated for default. Now, we're not told any of this. The contractor is going along. And what's interesting is the dynamic that happened when this shipment that the Navy says is unacceptable was accepted. September of 2000, the group comes in to inspect this lot. It's lot number six. It's made up of the Type II vests. At the end of the inspection, it's acceptable. Now, a question was raised, apparently internal, not to us, and one of the government tech people comes out. He wants to see how the backstitching operation is being done. He looks at it, says nothing, leaves. After the Navy people get back, they write what amounts to a dissenting opinion on the acceptability of these vests. The DSCP technical expert testified that as far as he was concerned, everybody was in agreement. The vests were acceptable. But apparently later, the Navy representatives decided that they weren't because primarily of this one operation, the backstitching. Their contention was that the appellant was not doing it correctly. Had they advised the contractor of that concern, very easily remedied. There was an alternate way to do the backstitching. You just simply put a bar tack at the bottom of the zipper and it's an automatic piece of equipment that they had. They could have avoided that problem completely. But nobody told us. So meanwhile, the contractor goes along his merry way, producing these items the same way he had produced them for the last year and a half, in a method that clearly the Navy had decided was unacceptable, and yet nobody tells him. Mr. Lambert, clearly there's evidence in this record to show that there were, for lack of a better expression, mixed signals on inspections and some confusion associated with that. But the ultimate conclusion of the trial court was that the contractor failed to meet the delivery schedules and it was the delay that caused the termination. And some of this delay, I think, occurred even prior to the first problem with respect to inspections. Isn't that correct? That's correct. But a new delivery schedule, after all the initial problems were overcome, a new delivery schedule was put in place in June of 2000. But we have to find that there was clear error in the conclusion that the delay caused the breach. Well, the situation with the delay was such, though, that the contractor also testified that, notwithstanding the delay, that he had opted not to terminate the contract for default. He was going to let the contractor submit those two lots in November, lots 8 and 9. And, obviously, the implication was, had they passed, then the contractor would have been close enough to the delivery schedule to allow him to continue. So, in a sense, yes, was there a delay? We can argue about why there was, the other lot that was rejected in September. But there was a delay. But yet the contracting officer essentially said, I'm going to wait and see what happens when those two lots in November are presented, lots 8 and 9, and we'll see, I'll wait until, and I think he said something to the extent of, I'm going to give him every chance. If those two lots are accepted, they would have been, I don't remember the total number, something on the order of 1,000 vests that would have been delivered at that point immediately. So, effectively, yes, was it terminated for failure to deliver? Yes. But the testimony from the contracting officer was, he was waiting to see what happened on these two lots that were presented as to whether or not then he would make the decision to terminate. When those two lots were presented and they failed, yes, he then terminated for failure to deliver. So, the point being that had those two lots not failed, the contracting officer's testimony was that, essentially, he would have allowed the contractor to continue because, while he would have been late, he would not have been substantially late. So the issue comes down to, now, what happened on those inspections? Essentially, two things happened. One is the problem with the backstitching that had never been brought to the attention of the contractor throughout all those debates back and forth between the Navy and the SCP rears its ugly head and virtually every vest is rejected for the defective backstitching, which would have been easily remedied. And the other issue that comes into play here, I think the appellee argues and the court found, notwithstanding the fact that the Navy had said the Navy considers these vests to be unacceptable, that the contracting officer testified the final decision was DSCP's. Whether or not the vests would be accepted would be DSCP's decision. So, therefore, whether the Navy found them unacceptable and recommended termination for default did not matter. It was DSCP's call. All true, except for one problem with that thesis, and that is that when those lots were inspected and the testimony from the leader of the team, the government's tech expert, Mr. Bailey, was that they had six inspectors and they divided the vests up. Each inspector took his own quantity. Of those six, two were from the Navy. You had one from DSCP, two from the Defense Contract Administrative Service. You had one from the Army and two from the Navy. So they divided them up. And as we showed, if you take the inspection results and you break them down by inspector, there's an incredible difference in the defects reported. And, again, I'm putting aside the backstitching because clearly that was something they decided was a problem, they just never told us. If you look at the Navy inspectors found virtually every vest to be defective for at least one, if not two, incidents wrong, whereas the other inspectors from DSCP and from the DCMA and even from the Army, there was an odd defect here, an odd defect there, but essentially they found nothing wrong with those vests. So, again, in a sense we're not arguing any ill will. What we're arguing is that you had a new specification and a new item, a first-time contract, and an inability on the part of the government to have everybody on the same page as to what was an acceptable vest. Now, is there, granted that there's apparent, some at least, apparent inconsistency in the manner in which the inspections were done, the results of the inspections, but is there any question on this record as to whether the determinations of noncompliance with the specifications were wrong? In other words, are these acceptable vests that were rejected? Given the fact that nobody has a chance to look at the, necessarily, to produce all the vests that were rejected in court, I cannot assert that every one of the instances is wrong. What we did do, fortunately, from the government's inspection reports, what we pointed out is that in subsequent inspections of that, when the contractor tried to get that lot, that last lot through, when the government did subsequent inspections, they happened to pull two vests that had been inspected earlier, in earlier inspections. I think it, and we dealt with these, I think the numbers were, each vest had a serial number. The evidence showed vest 3247 and 3779, minutiae here, that vests that the first time they were inspected, vests that didn't have defects weren't necessarily reported. These two vests exhibited defects the first time they were inspected. One was 3247, had some threads not trimmed, and 3779 had the edges of the binding tape not seared, which DSCP decided later wasn't a defect anyway. The second time these vests came up for inspection, different defects were scored. On vests that had already been looked at once, and each one found a certain defect, the second time they were looked at, the inspectors found a different defect. Well, I guess where I'm going with that question is, suppose you've got a situation where the spec calls for five pockets on the vest, and the vests are made with four pockets, but the inspectors let two groups of them go through, and they don't object to the fact that there's a missing pocket. Can the contractor come back and say with a kind of estoppel type argument, well, you let those through, and therefore I assumed that in effect you weren't requiring a fifth pocket, and therefore it's inappropriate later to knock out the vests on the ground that they don't have the specification required fifth pocket. That's a tough one because there is a doctrine of waiver where if you have a requirement, the government may waive a requirement. It has to be pretty explicit. Well, waiver by a sense of interpretation. It would be tough to interpret something that clearly said it needed five pockets as then saying it needed four. But the issue is interpreting, for example, and I don't want to get into this, but the definition of what is evenly spaced. I mean, do you need a micrometer? Do you need a ruler? So the contractor has to rely on some consistency, and that's what we're talking about here, a consistency and if the government comes to the point of deciding something is wrong, tell us. Thank you. Ms. Burke. May it please the Court, the trial court's judgment should be affirmed. H&S's failure to deliver was the direct cause of at least the first termination and the second termination, but that's a little more complicated. With respect to the first termination of Type 1 vests, I'd like to focus the Court's attention on the chronology of events between late August and October of 2000, and I'd like to clarify what appears to be a misunderstanding on the part of H&S. On September 15th, H&S was to deliver 886 Type 1 vests. On October 15th, H&S was supposed to deliver 886 Type 1 vests. On September 19th, H&S delivered 250 Type 1 vests that failed inspection. This period of time predates the alleged inconsistent inspections that H&S complains about having occurred in November of 2000. But the contract was not terminated at that point. The portion of the contract that covered Type 1 vests was terminated as of November 3rd, 2000. H&S is absolutely incorrect that DSCP was waiting to see what would happen in November of 2000. The contracting officer testified that it takes at least a couple of weeks to get a termination for default from his desk through all of the necessary people. I think he said there were either four or six people that had to go through, and it takes at least two weeks, if not a month, to get the termination signed off on. The termination was effective November 3rd. The notice is dated November 9th, so the termination is backdated. The period of time that H&S complains about is the November 1st, November 2nd inspection time. It failed to deliver roughly 1,700 vests during the September and October lots that it presented. And that is the period of time that led to the termination. It delivered 250 of 1,700 required vests. That is woefully short of what it was supposed to deliver. And we can stop right there with respect to the Type 1 vests because H&S cannot even contend that it could have cured it in the November lots because if you look at what it presented in November, it presented 118 Type 1 vests. So even if that lot had passed, and I can point the court to the record, page 149 and 150 of H&S's appendix. And this is the product verification record for Roman numeral number 9. Type 1 vests, and it says right under Roman numeral 9, it presented 118 vests. If it wanted to deliver the required number, it would have had to deliver the 1,700 vests, roughly 1,700 vests that it didn't deliver in the prior two months, plus an additional 886 that were due on November 15th. Instead, it delivered 118 Type 1 vests. Even if, and again, even if that lot had passed, which it did not, it still would have been thousands of vests short. With respect to the Type 2 vest termination, which occurred in March of 2001, it's important to recognize first the credibility determinations that the trial court made. The trial court specifically found that the contracting officer and the quality assurance specialist who testified were credible, that they approached H&S at each time with all of the problems that the government noted about H&S's performance. The trial judge found that contrary to H&S's contention, DSCP went out of its way to help H&S through this contract. And as Mr. Lamer stated, when H&S began the contract in 1999, it had significant problems with early production. DSCP waited approximately one year, had constant contact with H&S, trying to come up with a sort of universal understanding of how everyone was going to proceed with this contract, and really, quite frankly, it could have terminated the contract back then. But the contracting officer's testimony was very clear that it wanted to work with H&S on this contract because it was a new product. DSCP wanted H&S to lend the government its expertise. So it helped H&S through the process, hoping that if they just worked with them enough, that eventually H&S would be able to take on the large burden of manufacturing that this contract required. But it just simply couldn't. And what I'd like to point the court to, specifically, is the way that H&S responded to the inspections that occurred on November 1st and November 2nd. Now, if you look at the inspection reports, which, again, appear at pages 134 and 149 of H&S's appendix, volume one, Mr. Lamer is absolutely correct that the issue of backstitching appears here in a volume that is unprecedented. What I'd like to point the court's attention to are some other problems that, standing alone, would have failed these lots. Specifically, on page 135 and page 150, you see a handwritten notation that says needle chew, and you see two marks next to it indicating that there are two critical defects. If you look to the sample size on the previous page, you see that if there are two critical defects in any lot, that constitutes a rejection. To be clear, this is two of the tested items had this one defect? Not necessarily. Is that what they mean by two critical defects? Or one item has two defects? It could be either. It could be either.  Can't tell, I guess. Well, it looks to me, and Mr. Lamer can probably correct me if I'm wrong, but it looks to me that, at least with respect to page 150 where I'm looking, the needle chew defect is appearing on only one vest, so it's only noting one serial number. Serial 3631. Right. So, for example, if it was appearing on two vests, then there would be two serial numbers, like there is right above it. But that doesn't necessarily have to be that way. It could just be one defect per vest. But in this instance, it looks like it's two defects on one vest. What's particularly important about this is that H&S fixed this problem. It acknowledged that this problem existed, and it fixed it. And if you turn to page 166 and 167 of that same volume, you see H&S's letter to DSCP in response to these inspection reports. And on page 167, it says, defects number one and two, and the needle chew is defect number one. Defects will be repaired and the entire lot re-inspected. Those two defects alone were enough to fail this lot. And H&S obviously agreed that those defects existed, and H&S was prepared to fix them. So regardless of whether there were inconsistent inspections, and the trial court found that there were not, but regardless of that issue, which is a little bit of a red herring, these lots would have failed inspection. And with respect to the final issue, which was not specifically raised by Mr. Lamer, the issue of the expert's testimony, the trial court absolutely properly rejected the expert's testimony. And the reason goes back to what I was just saying. The statistical analysis provided by the expert had some calculation flaws in it. But that aside, did not take into account the fact that, time and again, H&S was acknowledging certain defects and fixing certain defects. And that's the important thing to remember, especially when we get to the Type 2 vests. Aside from the fact that the trial court found the government inspectors to be highly credible and to know what they were doing, even if there was some confusion with respect to how things should be scored, H&S acknowledged that certain problems existed and they were willing to fix them, and those problems were enough to justify a termination for the Type 2 vests. For these reasons, we respectfully request that the court affirm the judgment of the trial court. Thank you, Ms. Burke. Mr. Lamer, you have about two minutes. I don't need to go on. Just briefly. As Ms. Burke suggested, it does take some time to terminate a contract for default. But if you go from the time frame when H&S first fell behind the Type 1 vests with the rejection of Lot No. 6, we're talking about September, roughly September 19th. The termination did not come until after the rejection of the next presentation of Lot No. of Type 1 vests, which was in early November. So you're looking at about six to seven weeks. Now, I'm not suggesting the government wait the delivery schedule, but the government clearly waited until after that next presentation before the termination came. And in the record, the contracting officer testified as to he attended that inspection on November 1st. And at that point, the termination letter had not gone out. It apparently was drafted. It didn't go out until the 9th after that rejection. And was asked by Ms. Burke if he had a conversation with Mr. Holland. And he said he had a lot of them. Where are you reading? Oh, I'm sorry. Page 439 in the Appellant's Appendix. And he testified. He said, I had a lot of conversations with Mr. Holland. And around this time, if I talked to him during this time, I would never have said anything like that, meaning that everything was going to be all right. I had no reason to. If anything, I would have just stated that. I would have said something along the lines that the government is seriously considering termination because of your missed delivery and there are some major problems. There was no need for me to say anything else. That conversation, if you accept the record, came at a time when that letter had already been drafted to terminate the contract for default. And the contractor was saying he would have said something along the lines of, well, we're considering it at the time of that other inspection. And the only other thing I would comment on, Ms. Burke made reference to the credibility of the inspectors. Only one inspector testified, and that was Mr. Bailey, who testified that he thought that lot number 6 was acceptable and everybody agreed to that before they left. Thank you. Thank you, Mr. Holland. Thank you, folks. Counsel. The case is submitted.